IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 21-4634

———————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

XAVIER HOWELL,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Norfolk
*The Honorable John A. Gibney, District Judge*

———————————

RESPONSE BRIEF OF THE UNITED STATES

———————————

Jessica D. Aber                    Aidan Taft Grano-Mickelsen
United States Attorney             Andrew Bosse
                                   Amanda Turner
                                   John F. Butler
                                   Assistant United States Attorneys
                                   8000 World Trade Center
                                   101 W. Main Street
                                   Norfolk, Virginia 23510

*Attorneys for the United States of America*

## Table of Contents

                                                                          Page

Introduction ..........................................................................................1

Issues Presented ....................................................................................3

Statement of the Case ...........................................................................4

     A.  The September 27 Traffic Stop .................................................4

     B.  The Procedural History ..........................................................12

Summary of Argument...........................................................................15

Argument................................................................................................17

   I.  The officers had adequate reasonable suspicion of narcotics
       trafficking to conduct the traffic stop. ........................................19

  II.  Defendant's outstanding warrant provided an independently
       sufficient basis for the traffic stop. .............................................29

     A.  Officers may conduct an investigatory stop to gather more
        information about an out-of-jurisdiction warrant.................................29

     B.  The officers relied in good faith on the warrant and department
        polices.................................................................................34

Conclusion .............................................................................................37

Statement Regarding Oral Argument ....................................................38

Certificate of Compliance ......................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Williams*,
  407 U.S. 143 (1972) .................................................................. 20, 34

*Alabama v. White*,
  496 U.S. 325 (1990) ............................................................ 17, 20, 21

*Arizona v. Evans*,
  514 U.S. 1 (1995) ............................................................................ 35

*Bailey v. United States*,
  516 U.S. 137 (1995) ....................................................................... 22

*Capone v. Marinelli*,
  868 F.2d 102 (3d Cir. 1989) .......................................................... 31

*Case v. Kitsap Cnty. Sheriff's Dep't*,
  249 F.3d 921 (9th Cir. 2001) ......................................................... 31

*Draper v. United States*,
  358 U.S. 307 (1959) ....................................................................... 20

*Florida v. J.L.*,
  529 U.S. 266 (2000) ....................................................................... 19

*Herring v. United States*,
  555 U.S. 135 (2009) .................................................................. 34, 35

*Illinois v. Caballes*,
  543 U.S. 405 (2005) ....................................................................... 33

*Illinois v. Gates*,
  462 U.S. 213 (1983) ....................................................................... 21

*Illinois v. Wardlow*,
  528 U.S. 119 (2000) .................................................................. 18, 22

*Kansas v. Glover*,
  140 S. Ct. 1183 (2020) .............................................................. 18, 28

ii

*McCray v. Illinois*,
    386 U.S. 300 (1967).....................................................................20

*Mendoza v. U.S. Immigr. & Customs Enf't*,
    849 F.3d 408 (8th Cir. 2017)......................................................31

*Navarette v. California*,
    572 U.S. 393 (2014)............................................... 18, 19, 25

*Stokeling v. United States*,
    139 S. Ct. 544 (2019).................................................................20

*Terry v. Ohio*,
    392 U.S. 1 (1968)........................................................................22

*United States v. Abdus-Price*,
    518 F.3d 926 (D.C. 2008)..........................................................22

*United States v. Arthur*,
    764 F.3d 92 (1st Cir. 2014).......................................................22

*United States v. Arvizu*,
    534 U.S. 266 (2002)....................................................................17

*United States v. Branch*,
    537 F.3d 328 (4th Cir. 2008) ...................... 26, 28, 29, 33

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975)....................................................................26

*United States v. Brown*,
    701 F.3d 120 (4th Cir. 2012) ....................................................29

*United States v. Bumpers*,
    705 F.3d 168 (4th Cir. 2013) ....................................................23

*United States v. Cloud*,
    994 F.3d 233 (4th Cir. 2021) ....................................................19

*United States v. Davis*,
    235 F.3d 584 (D.C. Cir. 2000)..................................................22

*United States v. Farnell*,
    701 F.3d 256 (8th Cir. 2012) ....................................................22

iii

*United States v. Foster,*
    634 F.3d 243 (4th Cir. 2011) ...................................................................26

*United States v. Foster,*
    824 F.3d 84 (4th Cir. 2016) ................................................... 17, 19

*United States v. Ganser,*
    315 F.3d 839 (7th Cir. 2003) ...................................................................22

*United States v. Gardner,*
    823 F.3d 793 (4th Cir. 2016) ...................................................................20

*United States v. Gondres-Medrano,*
    3 F.4th 708 (4th Cir. 2021) ............................................. 4, 19, 20

*United States v. Green,*
    740 F.3d 275 (4th Cir. 2014) ...................................................................33

*United States v. Hager,*
    969 F.2d 883 (10th Cir. 1992) .................................................................22

*United States v. Harris,*
    39 F.3d 1262 (4th Cir. 1994) ...................................................................21

*United States v. Hensley,*
    469 U.S. 221 (1985)........................................................... 30, 32, 33

*United States v. Hensley,*
    713 F.3d 220 (6th Cir. 1983) ...................................................................31

*United States v. Hurst,*
    228 F.3d 751 (6th Cir. 2000) ...................................................................22

*United States v. Jordan,*
    952 F.3d 160 (4th Cir. 2020) .................................................. 23, 28

*United States v. Kehoe,*
    893 F.3d 232 (4th Cir. 2018) ...................................................................24

*United States v. Leon,*
    468 U.S. 897 (1984)...................................................................................34

*United States v. Marshall,*
    872 F.3d 213 (4th Cir. 2017) ...................................................................17

iv

*United States v. Mason*,
  628 F.3d 123 (4th Cir. 2010) ............................................................ 28, 29, 33

*United States v. McClinton*,
  135 F.3d 1178 (7th Cir. 1998) ...........................................................22

*United States v. McCoy*,
  513 F.3d 405 (4th Cir. 2008) .............................................................18

*United States v. McDonald*,
  606 F.2d 552 (5th Cir. 1979) .............................................................31

*United States v. McDowell*,
  745 F.3d 115 (4th Cir. 2014) .............................................................7

*United States v. Mitchell*,
  963 F.3d 385 (4th Cir. 2020) ....................................................... 18, 28

*United States v. Mosley*,
  878 F.3d 246 (8th Cir. 2017) .............................................................21

*United States v. Palmer*,
  820 F.3d 640 (4th Cir. 2016) .............................................................26

*United States v. Price*,
  184 F.3d 637 (7th Cir. 1999) .............................................................22

*United States v. Rush*,
  808 F.3d 1007 (4th Cir. 2015) ...........................................................35

*United States v. Singh*,
  363 F.3d 347 (4th Cir. 2004) ....................................................... 20, 24

*United States v. Sokolow*,
  490 U.S. 1 (1989) .................................................................. 17, 26, 31

*United States v. Villasenor*,
  608 F.3d 467 (9th Cir. 2010) .............................................................22

*United States v. Williams*,
  808 F.3d 238 (4th Cir. 2015) .............................................................27

*United States v. Wilson*,
  964 F.2d 807 (8th Cir. 1992) .............................................................22

*Whiteley v. Warden*,
  401 U.S. 560 (1971).............................................................................30

**Statutes**

18 U.S.C. § 1956...................................................................................12

21 U.S.C. § 841.....................................................................................12

**Other Authorities**

LaFave, Wayne. Search and Seizure § 9.5 .............................................22

vi

## INTRODUCTION

A reliable confidential informant told two detectives that a specific drug dealer would be meeting other dealers to trade in narcotics at a local hotel, known for hosting narcotics deals. Upon investigating the hotel, the detectives did not find the named suspect but found defendant Xavier Howell's name in the hotel registry. The detectives knew Howell lived out of state, had a previous narcotics-related arrest and conviction, and had been identified by other informants as involved in narcotics trafficking. Even though he had local relatives, defendant spent a single night in the hotel, matching a known pattern of narcotics traffickers. He then departed the hotel at the time the informant had indicated the traffickers would be leaving, in the only vehicle that matched the informant's description, and accompanied by a woman, as the informant had suggested.

When checking an interstate database of outstanding warrants, the detectives discovered that Howell also had an arrest warrant from his home state but, according to department policy, needed to engage with him before contacting the issuing jurisdiction. Uniformed police officers then stopped defendant as he was driving below the speed limit and ran a second warrant check. This check again revealed the warrant, though with the additional information that it was non-extraditable. According to department policy, having detained defendant and received the warrant notifica-

1

tion, the uniformed officer was now required to call the issuing jurisdiction to confirm that the warrant was still non-extraditable. While he was doing so, a drug-sniffing dog arrived and alerted on the vehicle. In a subsequent search, officers found almost 1.8 kilograms of nearly pure methamphetamine along with other incriminating evidence of trafficking.

Perfect information has never been required for reasonable suspicion. Here, the specific identity of the informant's narcotics trafficker was incorrect, but a number of the informant's other facts—time, place, vehicle, companion—lined up with other characteristics—prior narcotics involvement, a known location for traffickers, a single-night stay when one has local relatives, driving patterns consistent with illegal activity. Moreover, the independent arrest warrant from Georgia—whether alone or with the other information—further supported the traffic stop of defendant's car, and the duration did not exceed the purposes of the stop. Accordingly, the district court correctly denied defendant's motion to suppress, and this Court should affirm.

## ISSUES PRESENTED

**1.** Information from a reliable confidential informant about a meeting of narcotics traffickers at a known trafficking location substantially matched up with defendant, whom investigating detectives had previous reason to believe was involved in narcotics trafficking. Did the officers have reasonable suspicion of such trafficking to justify a ten-minute traffic stop?

**2.** A law enforcement database check revealed that defendant had an outstanding warrant from Georgia. Department policy required officers to stop defendant and contact the issuing jurisdiction through a computerized system to determine the current status of the warrant. Was the officers' traffic stop independently reasonable on this basis, and did the length of the stop comport with the reasonable requirements of that confirmation?

## STATEMENT OF THE CASE

### A.     The September 27 Traffic Stop

Construed in the light most favorable to the government, the evidentiary hearing and trial established the following facts. *See, e.g.*, *United States v. Gondres-Medrano*, 3 F.4th 708, 713 n.1 (4th Cir. 2021).

On September 26, 2019, Chesapeake Police Department Detectives Adam Beha and Joseph Milewczik received information from a reliable confidential informant that an out-of-state drug trafficker—who was not the defendant—would be trafficking a significant amount of narcotics into Chesapeake. JA64, 149. This informant had consistently provided reliable information to state and federal officials, which had been repeatedly corroborated and had led to several state and federal arrests and convictions. JA65, 149.

The informant told Detectives Beha and Milewczik that the trafficker—whom the government will identify as Target A in this brief—would be transporting a large amount of controlled substances into Chesapeake for distribution to other traffickers. JA65. The informant later relayed to the detectives that Target A would be staying overnight at the Aloft Hotel in Chesapeake, Virginia. JA65. The informant also told the detectives that Target A would be driving a dark-colored or black rental SUV rental with out-of-state tags and would be accompanied by an unknown African-American woman. JA65. The informant explained that multiple drug dealers were

to meet at the hotel and that the distribution of the trafficked substances would happen at the hotel. JA65. The confidential informant told the detectives that Target A and the other narcotics traffickers would leave the Aloft Hotel on the morning of September 27. JA29, 150.

Corroborating the informant's tips, the detectives knew that particularly out-of-state traffickers use rental cars to avoid having their name appear if the registration is checked by law enforcement. JA66. The detectives further knew that traffickers prefer short stays in hotels, as further protection against law enforcement and other distributors. JA66. Additionally, the detectives knew the Aloft Hotel in particular was a favored location for narcotics traffickers, based both on interviews with traffickers (JA66–67) and multiple drug-related arrests and seizures from the hotel (JA67–68). In these interviews, the detectives learned that distributors prefer hotels like the Aloft for its amenities and common-area spaces, because they fear robbery by other distributors and do not want their counterparts to know the location of their rooms or of their other drugs or money. JA67.

At approximately 7:00 a.m. on the morning of September 27, 2019, Detective Milewczik began conducting surveillance at the Aloft Hotel. JA68, 150. Initially, the detectives attempted to find the rental SUV matching the informant's description but found no comparable vehicle at the hotel. JA68, 94. Just before 10 a.m., Detective Milewczik then went inside and obtained the hotel's guest registry from the staff

to see if they could find Target A's name or, because of the information that other distributors would be present, any names the detectives already knew that had connections to narcotics trafficking. JA68, 150. Although Target A's name was not in the registry, Detective Milewczik recognized two names on it, including defendant's, that the detectives knew from involvement in prior drug trafficking investigations. JA69, 150. The registry showed defendant staying at the Aloft only one night. JA86.

In particular, Detective Beha knew defendant's name from an FBI drug enforcement task force investigation five years prior. JA69, 150. The task force had conducted controlled buys of cocaine from a business in Portsmouth, Virginia; the operation resulted in a federal indictment and guilty plea. JA69. Detective Beha had found defendant's name listed as one of the directors of the company from which the controlled buys were conducted. JA69–70. After finding defendant's name, Detective Beha had then checked his criminal history and found a previous arrest for a controlled-substances trafficking offense in Virginia; the detective believed that arrest had resulted in a guilty plea to possession with intent to distribute under a plea agreement. JA70, 86, 92–93.[1] Moreover, as Detective Beha had conducted further

---

[1] Detective Beha was also aware of other arrests in New Jersey, Colorado, and Georgia. JA73.

interviews with informants a year or two after that controlled buy, two of them iden-
tified defendant as involved in the narcotics trafficking, and one of them specifically
observed him with controlled substances. JA71–72. As a result of that information,
Detectives Beha and Milewczik had defendant listed as potentially part of an ongo-
ing trafficking conspiracy and had been tracking defendant's social media prior to
the present informant's tip. JA72.

Around 10 a.m. on September 27, having this background context and seeing
defendant's name on the registry, Detective Beha then ran a search on the Virginia
Criminal Information Network/National Crime Information Center (VCIN/NCIC)
for defendant as well as the other subject recognized in the hotel registry. JA73, 76.
The VCIN/NCIC is a computerized database in which criminal justice information
is entered by a jurisdiction and can be searched by other law enforcement agencies.
*See* JA49.[2] This search returned defendant's criminal history as well as a caution
warrant, a notification that a warrant for failure to appear was outstanding. *See* JA74,
150; *see also* JA45 (Exh. 1).

The VCIN/NCIC entry contained a note to confirm that the warrant was still
outstanding from the Sheriff's Office of Crawfordville, Georgia. JA76. However, at
that point, Detective Beha was not sure whether defendant was still in Virginia.

---

[2] *See also United States v. McDowell*, 745 F.3d 115, 118 (4th Cir. 2014) (de-
scribing the NCIC).

JA102. Moreover, Chesapeake Police Department policy dictates that an officer or detective must have contact with or the subject detained prior to completing an inquiry of the issuing jurisdiction, in order to avoid wasting the resources of either department if there is no opportunity for arrest. JA76, 79. The policy further provides that individual officers cannot contact issuing jurisdictions; such contact must be conducted by Emergency Communication Center (ECC) personnel using a computerized system, which prompts the issuing jurisdiction to respond. JA79; *see* JA47–48 (Exh. 2), at III.I. The computerized system also permits jurisdictions to confirm that the inquiry truly originates from a law enforcement officer. JA111–12.

While Detective Beha's VCIN/NCIC inquiry through a system called LERMS does not return information on whether a particular warrant is extraditable, an officer's patrol car has a laptop or computer system called Mobile that does return that information. JA77, 101. Even when a warrant shows as non-extraditable on Mobile, however, Chesapeake Police Department policy requires officers to contact the ECC personnel, who will contact the issuing jurisdiction to see if the warrant status has changed. JA80; *see* JA47–48, at III.I. This confirmation is required because the warrant status in the database can change or no longer be current; Detective Beha had personally encountered such changes, both from a non-extraditable warrant to extraditable and from an extraditable to cancellation of the warrant. JA80–81. Detective

Beha understood the Chesapeake Police Department policy to implement the national NCIC policy manual (JA82–83), which likewise instructs that "Correct NCIC/VCIN procedure requires the agency which placed the record in file be contacted by the inquiring agency to confirm that the data is accurate and up-to-date" (JA49 (Exh. 3)).

Just prior to noon, Detective Beha and his team observed a black Cadillac SUV with Georgia license plates pull up to the front of the Aloft Hotel. JA83, 150. Detective Beha determined that the SUV was a rental car because it had a sticker he recognized as being present on rental cars. JA107. Detective Beha recognized defendant, who exited the driver's seat and entered the hotel; defendant returned approximately ten minutes later with a black Puma duffel bag, which he placed in the rear driver-side seat. JA83–84. While defendant was inside the hotel, Detective Beha saw an African-American woman exit the front passenger seat and stand by the side of the car. JA84.[3] After defendant returned, they both re-entered the car with defendant driving and drove out of the hotel parking lot. JA84.

---

[3] Officers later identified this woman as defendant's sister. JA150–51. Although Detective Beha knew that defendant had two sisters, he had never seen either and could not identify her on sight. JA108.

Detective Beha and his team then followed defendant's car as he drove. JA84. The detective noted that defendant consistently drove five to ten miles per hour under the speed limit and used his turn signal an excessively cautious amount prior to changing lanes. JA84. In conjunction with the other known facts about defendant and the informant's descriptions, Detective Beha considered this cautious driving to be an attempt to avoid recognition or detection. JA84–87. Via radio, he then directed Chesapeake Patrol Officer Kenneth Byrd to conduct a traffic stop of defendant's car after informing the officer of the warrant and the narcotics investigation. JA101, 124.

Officer Byrd conducted a traffic stop of defendant's car at 12:06 p.m., after being advised of the outstanding warrant and the narcotics investigation by the detectives' investigating team. JA114, 151. The Mobile system requires detailed information such as name, date of birth, and Social Security number to confirm the identity of the person whose records are returned. JA122–23, 125–26. Because Officer Byrd had experience with stopped individuals fleeing after being informed that they have been stopped for an outstanding warrant, he told defendant that the license plates did not match the car registration and obtained his license and registration. JA115. Using defendant's license number, Officer Byrd queried the Mobile system, which returned the active warrant and showed it as non-extraditable. JA115–16. Officer Byrd confirmed that department policy required him to have a suspect detained

10

prior to contacting dispatch and then to have the dispatcher confirm even non-extra-ditable warrants through the VCIN and ECC systems. JA116–18, 129. The VCIN Operations dispatcher confirmed to Officer Byrd that the warrant was non-extradita-ble between 12:21 p.m. and 12:22 p.m., about ten minutes after his initial request. JA119.

Around 12:11 p.m., five minutes after the stop commenced and a minute or two after Officer Byrd transmitted the warrant hit to the dispatcher, Detective C.J. Rombs arrived at the stop. JA119, 132, 151. Detective Rombs brought Doug, his Belgian Malinois K-9 partner, who is trained to alert on five illegal narcotics, in-cluding marijuana, heroin, cocaine, ecstasy, and methamphetamine, and with whom Detective Rombs had conducted over a hundred stops. JA130–31, 208–09. After Detective Rombs asked the woman in the front seat to step out of the vehicle, she informed him that she had a two-week-old baby in the car; Detective Rombs allowed her to step outside with the baby and then walked Doug around the SUV. JA133, 211. Detective Rombs then observed Doug alert to narcotics next to the open driver-side door, which he then followed to the side of the driver's seat underneath the seat. JA134, 212. Detective Rombs began the free-air sniff with Doug approximately five minutes after arriving (around 12:16 p.m.), and Doug alerted approximately thirty second after beginning the sniff (between 12:16 p.m. and 12:17 p.m.). JA134–35. After Doug alerted outside of the car, Detective Rombs allowed him into the car,

11

where he alerted again on the black duffel bag, a baby diaper bag, and a U.S. Postal Service box on the back seat. JA135–36, 212–13.

Detective Rombs then secured Doug and searched the vehicle, finding approximately 1.78 kilograms of methamphetamine in the USPS box, as well as other incriminating documents, cell phones, mailing and packaging materials, and U.S. currency. JA136, 151; *see also* JA50–52 (Exh. 4), 89–90, 228–40. The methamphetamine had a purity level of 91% (± 6%), commonly known in this form as "ice." JA230.

**B.    The Procedural History**

A federal grand jury charged defendant with four offenses: conspiring to possess methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count 1); two counts of possessing methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (Counts 2–3); and conspiring to launder money, in violation of 18 U.S.C. § 1956(h) (Count 4). *See* Dkt. 100.[4]

---

[4] The joint appendix in this case contains the first indictment returned for defendant but not the superseding indictment returned on Oct. 8, 2020, on which defendant was tried. Accordingly, the government provides the relevant document number from the district court docket, No. 2:20-cr-11 (E.D. Va.).

Defendant filed a motion to suppress all of the evidence obtained as a result of the September 27 traffic stop, arguing that the officers lacked reasonable suspicion for the stop and unconstitutionally extended its duration. JA21–27.[5] After full briefing, the district court held an evidentiary hearing, in which it heard testimony from Detective Beha, Officer Byrd, and Detective Rombs. JA60–148. The district court then denied defendant's motion to suppress in an opinion and order, concluding that the confidential informant's tip combined with the other facts known to the detectives established reasonable suspicion of narcotics trafficking and the stop was not unconstitutionally prolonged. JA153–57. The court declined to address the government's alternative argument that the outstanding Georgia warrant also justified the stop and did not rely on the warrant in finding reasonable suspicion. JA153 n.2, 157 n.9. Defendant moved for reconsideration, arguing that the court had misunderstood the nature of the confidential informant's tip, but the court denied the motion, stating that it had correctly understood the testimony. JA160–162, 163.

Having waived a jury trial, defendant proceeded to a bench trial between July 12 and July 14, 2021, during which the government called a dozen witnesses and

---

[5] Among the evidence discovered in the vehicle search, Detective Rombs found an address for an apartment, to which he took Doug, who alerted again. JA216–20. After obtaining a search warrant for the apartment, officers found additional evidence of methamphetamine distribution, such as scales and bags, as well as fentanyl and evidence of money laundering. *See, e.g.*, JA241–71. Defendant's motion thus covered this additional evidence as fruit of the initial search.

entered approximately 200 pieces of evidence. JA380–622. Following that trial, the court found defendant guilty of all offenses. *See* 677–686.

The Presentence Investigation Report (PSR) calculated defendant's advisory Guidelines range as life imprisonment, given an offense level of 43 and a criminal history category of III. *See* Dkt. 200, at 1. The government recommended a downward variant sentence of 360 months. *Ibid.* On November 12, 2021, the district court sentenced the defendant to 360 months' imprisonment, followed by a five-year term of supervised release. JA10, 689. Defendant timely noted an appeal on the same day. JA10, 687.

## SUMMARY OF ARGUMENT

The district court correctly denied defendant's motion to suppress.

First, the detectives had ample reasonable suspicion of narcotics trafficking when they instructed Officer Byrd to conduct a traffic stop. Specifically, numerous characteristics demonstrated by defendant matched those provided by a known, reliable confidential informant: the color and type of car, that it was a rental, that defendant would be leaving that morning, that he had stayed only a single night at the hotel, that an unknown woman would travel with him. This information was corroborated by the detectives' personal knowledge of the Aloft Hotel's nature as a favored location for narcotics traffickers, as well as their knowledge of traffickers' use of rental cars and short hotel stays.

In addition, the detectives had reason to recognize defendant's name as a suspected narcotics trafficker; he had been a director of a business from which one detective had conducted controlled buys of cocaine, and he had been named by other informants as being directly involved, including personally possessing narcotics. When defendant left the hotel after only a brief ten-minute entrance, carrying a black duffel bag, and drove down the highway in a manner apparently designed to avoid attracting attention, the detectives had ample basis to order an investigatory stop.

Second, even apart from suspicion of narcotics trafficking, the detectives learned that defendant had an outstanding warrant from Georgia. The Supreme Court

has expressly approved the use of investigatory stops to determine the current status of other jurisdictions' interest in particular individuals. In doing so, the Court has held that officers may use a *Terry* stop to maintain the status quo while an officer determines whether a warrant has been issued. Accordingly, the officers acted reasonably by conducting a brief investigatory stop while confirming whether the warrant was still valid and whether it was extraditable. Even if the Court were to conclude otherwise, however, the officers acted in reliance in departmental policy and objectively reasonable good faith, and suppression would not be warranted.

## ARGUMENT

The district court properly denied defendant's motion to suppress. First, the officers had adequate reasonable suspicion of narcotics trafficking to justify the traffic stop and its duration until the K-9 unit alerted to the vehicle. Second, the existence of the outstanding Georgia warrant also provided reasonable suspicion to stop defendant for the purposes of confirming its status, and the justification for the stop did not dissipate before the K-9 alert.

An investigatory stop like a traffic stop is justified when an officer has "reasonable and articulable suspicion," *i.e.*, "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Foster*, 824 F.3d 84, 88 (4th Cir. 2016); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting that investigatory stops of vehicles require reasonable suspicion).[6] Reasonable suspicion requires "more than an inchoate or unparticularized suspicion or hunch" but "is obviously less demanding than that for probable cause," which requires only "a fair probability that contraband or evidence of a crime will be found." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) (noting that "reasonable suspicion can be established with

---

[6] Throughout its brief, the government has omitted internal citations, quotation marks, and alterations unless otherwise noted. *See, e.g.*, *United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

information that is different in quantity or content than that required to establish probable cause" and "from information that is less reliable than that required to show probable cause"). In determining whether reasonable suspicion exists, the Court "must consider the totality of circumstances—the whole picture." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020).

The reasonable-suspicion standard "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," and therefore requires this Court to "give due weight to commonsense judgments and inferences about human behavior made by officers in light of their experience and training." *Mitchell*, 963 F.3d at 390 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), and *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020)); *see also United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008) ("[T]he Supreme Court has often counseled lower courts to give due weight to the factual inferences drawn by police officers as they investigate crime, for the reasonable suspicion analysis is by its nature officer-centered."). Notably, "[f]acts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigatory stops based on what they view as suspicious—albeit even legal—activity." *Ibid.* Indeed, reasonable suspicion "need not rule out the possibility of innocent conduct." *Navarette v. California*, 572 U.S. 393, 403 (2014).

In reviewing a district court's ruling on a motion to suppress, this Court reviews legal conclusions de novo and factual findings for clear error. *United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021). The Court also construes the evidence adduced at the suppression hearing and at trial in the light most favorable to the government, which prevailed below. *See United States v. Gondres-Medrano*, 3 F.4th 708, 713 n.1 (4th Cir. 2021); *Foster*, 824 F.3d at 88.

## I. The officers had adequate reasonable suspicion of narcotics trafficking to conduct the traffic stop.

Defendant argues that the officers lacked sufficient reasonable suspicion that he was engaged in narcotics trafficking, in large part because the confidential informant had specifically identified another person—Target A—as being present at the hotel. But this argument elides the substantial amount of tipped information that did correspond to defendant in conjunction with the detectives' existing knowledge of defendant's relationship to narcotics trafficking.

As a general matter, the degree to which information gained from tipsters supports reasonable suspicion is based on their indicia of reliability. *See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 270 (2000). Anonymous tips may require observable corroboration both as to identity and assertions of illegality but also may contain such specific information, obtained through reliable means, to warrant an inference of reliability. *Compare id.* at 271–72, *with Navarette*, 572 U.S. at 398–404. By contrast,

both the Supreme Court and this Court consistently hold that tips from known, reliable informants stand on much stronger footing and may not require much, if any, external corroboration. *See, e.g.*, *Gondres-Medrano*, 3 F.4th at 716–718 & n.5 (citing cases). In *White*, for example, the Supreme Court described its prior decision in *Adams v. Williams*, 407 U.S. 143 (1972), as "assum[ing] that the unverified tip from the known informant might not have been reliable enough to establish probable cause but nevertheless [finding] it sufficiently reliable to justify a *Terry* stop." *White*, 496 U.S. at 330. Similarly, in both *McCray v. Illinois*, 386 U.S. 300, 302–04 (1967), and *Draper v. United States*, 358 U.S. 307, 312–13 (1959), the Supreme Court found investigatory stops justified based almost entirely on a known informant's identification of a particular individual's criminal activity, with minimal to no independent corroboration of any illegal activity. Similarly, this Court has observed that "when an investigative stop is based on unverified information provided by a known informant, a tip of this nature may alone justify a reasonable suspicion of criminal activity[,] [a]nd when police obtain information corroborating such a tip, this circumstance adds significant support for a finding of reasonable suspicion." *United States v. Gardner*, 823 F.3d 793, 799–800 (4th Cir. 2016), *abrogated on other grounds by Stokeling v. United States*, 139 S. Ct. 544 (2019); *see also United States v. Singh*, 363 F.3d 347, 355 & n.9 (4th Cir. 2004) ("Although an unverified tip from a known informant may alone justify a reasonable suspicion of criminal activity, the

Tip was not unverified. Indeed, it was substantially corroborated by the developing circumstances."); *United States v. Harris*, 39 F.3d 1262, 1269 (4th Cir. 1994) ("Information of criminal activity given by a known reliable informant is enough to sustain a *Terry* stop.").

Nor does a reliable informant's tip have to be perfectly consistent with the police's observations to create reasonable suspicion. In *Illinois v. Gates*, 462 U.S. 213, 245 n.14 (1983), which dealt with both an anonymous letter and the higher standard of probable cause, the Supreme Court found that "one inaccuracy in the anonymous letter" did not vitiate probable cause, even though the detail was somewhat significant, *i.e.*, that the suspect would fly, rather than drive. In doing so, the Court observed that "[w]e have never required that informants used by the police be infallible, and … [p]robable cause, particularly when police have obtained a warrant, simply does not require the perfection the dissent finds necessary." *Ibid.* In addressing the lower standard of reasonable suspicion, the Supreme Court then held that an anonymous tip that was "not as detailed, and the corroboration … not as complete, as in *Gates*," still sufficed to establish reasonable suspicion. *White*, 496 U.S. at 329.

Likewise, courts have repeatedly found that if sufficient reliability exists otherwise, discrepancies between the information in the tip and the officers' observations do not undercut an otherwise valid basis to believe criminal activity is occurring. *See, e.g.*, *United States v. Mosley*, 878 F.3d 246, 254 (8th Cir. 2017); *United*

*States v. Villasenor*, 608 F.3d 467, 474 (9th Cir. 2010); *United States v. Abdus-Price*, 518 F.3d 926, 931 (D.C. 2008); *United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003); *United States v. Davis*, 235 F.3d 584, 587–88 (D.C. Cir. 2000); *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000); *United States v. Price*, 184 F.3d 637, 641 (7th Cir. 1999); *United States v. McClinton*, 135 F.3d 1178, 1183–84 (7th Cir. 1998); *United States v. Wilson*, 964 F.2d 807, 809–10 (8th Cir. 1992); *United States v. Hager*, 969 F.2d 883, 886 (10th Cir. 1992), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995).[7] Indeed, a *Terry* stop allows officers to resolve discrepancies in information giving rise to reasonable suspicion and determine whether a suspect is indeed engaged in criminal activity. *See, e.g., Wardlow*, 528 U.S. at 125 ("*Terry* recognized that the officers could detain the individuals [who engaged in unprovoked flight from police] to resolve the ambiguity." (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968))). By the same token, reasonable mistakes of fact do not violate the Fourth Amendment. *See, e.g., Heien v. North Carolina*, 574 U.S. 54,

---

[7] *Cf.* Wayne LaFave, Search and Seizure § 9.5(h), nn.471–74 ("[I]nvestigating officers must be allowed to take account of the possibility that some of the descriptive factors supplied by victims may be in error." (citing *United States v. Arthur*, 764 F.3d 92, 98 (1st Cir. 2014) (generic description and general clothing provided reasonable suspicion in light of the proximity to the reported crime and absence of others); *United States v. Farnell*, 701 F.3d 256, 262 (8th Cir. 2012) (discrepancies in color of clothing did not defeat probable cause when car matched the type and driver shielded his face from police as he went by))).

61 (2014) (mistaken arrest of individual matching suspect's description may be reasonable).

Here, the detectives had a reasonable, articulable, and particularized basis to conclude that defendant was engaging in the narcotics trafficking described by the confidential informant at the Aloft Hotel.[8] As a preliminary matter, the confidential informant was a well-established source with a five-year track record of providing consistently reliable information to state and federal investigations, leading to arrests and convictions. JA64–65. But the detectives did not have to rely merely on the informant; substantial observable corroboration, along with the detectives' prior knowledge of defendant's involvement with narcotics, strengthened the specific reasonable suspicion. The informant described narcotics trafficking at a location that the detectives knew from multiple sources and personal experience to be a favored location of traffickers. *See* JA65–68; *see also United States v. Bumpers*, 705 F.3d 168, 175, 177 n.* (4th Cir. 2013) (noting the officer's awareness of "the violent history of this specific site" was a relevant contextual consideration that, combined with other factors, supported reasonable suspicion). The informant described a black SUV rental vehicle with out-of-state tags (JA65), a vehicle that matched none of the

---

[8] Under the collective knowledge doctrine, the detectives' knowledge is imputed to Officer Byrd, who initiated the actual stop on their instructions. *See, e.g.*, *United States v. Jordan*, 952 F.3d 160, 166 (4th Cir. 2020).

vehicles at the hotel until defendant arrived in one (JA68, 94, 83, 107, 150). *See, e.g.*, *United States v. Kehoe*, 893 F.3d 232, 239 (4th Cir. 2018) (noting that narrowing down a description to only one individual supports reasonable suspicion). The detectives further knew that the use of rental cars with out-of-state license plates matched patterns of narcotics traffickers in their experience. JA66. The informant informed the detectives that the narcotics traffickers would have a short overnight stay at the Aloft Hotel and leave on the morning of September 27. JA65, 150. From the hotel registry, the detectives learned that defendant stayed a single night at the Aloft (JA86), which again also matched their experience of narcotics traffickers using this hotel (JA66). The informant told the detectives that Target A would be accompanied by an unknown African-American woman (JA65), and the detectives then observed a then-unidentified African-American woman exit and stand beside defendant's rental SUV while he entered the hotel (JA84). Defendant also spent less than ten minutes inside the Aloft and then left with a black duffel bag on the morning the confidential informant stated that the narcotics traffickers would be leaving. JA65, 83–84, 150.[9]

---

[9] Defendant's brief argues that these facts somehow dispelled reasonable suspicion, because defendant "was traveling with luggage and his sister and her baby in plain view in broad daylight." Def. Br. 13. But this Court "assesses the relevant facts known to the authorities and decide whether those facts, from the standpoint of an objectively reasonable police officer, give rise to reasonable suspicion or probable cause." *Singh*, 363 F.3d at 354. First, the record is undisputed that Detective Beha did not know the woman was defendant's sister (JA108), and nothing in the record

But that's not all. At the time defendant left the Aloft having overwhelmingly shown similar characteristics to the confidential informant's tips, Detectives Beha and Milewczik had substantial other personal knowledge of defendant. Detective Beha had encountered defendant as the director of a business from which his task force had conducted controlled buys of cocaine. JA69–70. Detective Beha also conducted interviews with independent informants after those buys, and two of them identified defendant by name as involved in narcotics trafficking, including one who reported seeing defendant personally in possession of narcotics. JA71–72. In fact, Detectives Beha and Milewczik had continued to list defendant as a potential suspect in an ongoing local trafficking conspiracy and been consistently monitoring his social media for that reason. JA72–73, 86, 92, 95. As part of that investigation as well, Detective Beha knew that defendant had a 2008 conviction for possession with intent to distribute, which he believed had been the result of a plea agreement related to drug-trafficking charges on which defendant had been arrested. JA70, 85–86, 92–93.[10] Lastly, Detective Beha followed defendant as he drove away from the Aloft

---

suggests that any officer knew of the presence of a baby in the car until Ms. Howell informed Detective Rombs of that fact (JA211). Lastly, the sudden appearance of a black duffel bag after ten minutes in a hotel where a reliable confidential informant has warned of narcotics trafficking on that day hardly cuts against reasonable suspicion. *See, e.g.*, *Navarette*, 572 U.S. at 403 ("[W]e have consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct.").

[10] Defendant argues that his criminal history does not, by itself, create reasonable suspicion. *See* Def. Br. 11 (citing *United States v. Foster*, 634 F.3d 243 (4th Cir.

and noted that defendant's driving patterns—substantially under the speed limit and signaling turns excessively far in advance—suggested an intent to avoid attracting notice, which added to the detectives' belief that criminal activity may be occurring. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (noting that a "driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion"); *Sokolow*, 490 U.S. at 10 (noting that innocent characteristics that officers are trained to detect may be part of criminal activity have "evidentiary significance as seen by a trained agent").

Had the confidential informant provided the identical information but not identified Target A by name, all these facts together would cross well over the required threshold for reasonable suspicion. Accordingly, defendant rests the vast weight of his arguments on this fact, arguing that the informant's specification of a particular distributor renders all the informant's other information "irrelevant." Def. Br. 10, 15–16. Not so. As discussed above, courts regularly acknowledge that even

---

2011)). True enough—but "an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity." *United States v. Palmer*, 820 F.3d 640, 652 (4th Cir. 2016); *see also United States v. Branch*, 537 F.3d 328, 338 (4th Cir. 2008). Here, the detectives were not pursuing defendant based solely on prior criminal involvement but on the current circumstances of his presence at a specific time and place at which reported narcotics trafficking was occurring, the substantial similarities between the confidential informant's tip and defendant's on-scene characteristics, and the overlap of the tip and his characteristics with known patterns of narcotics traffickers.

in the face of erroneous, material information from tipsters, officers may still have reasonable suspicion based on substantial other reliable bases to suspect a particular individual of wrongdoing. But even separately, defendant's argument elides a key piece of the informant's tip. The informant in fact specified that Target A would be meeting other distributors at the Aloft to deal in narcotics and that they would all be leaving the same morning. JA29, 65, 150. In fact, it was this information that caused Detective Milewczik to check the registry, looking for the other potential distributors Target A would be meeting. JA68–69.

When defendant appeared—a man the detectives knew to have involvement in narcotics trafficking, driving the only car matching the informant's description, with a companion matching the informant's description, at a time and place indicated by the informant, staying less than ten minutes at the hotel and then leaving with a black duffel bag—the detectives had ample objective reason to suspect that defendant was engaged in the described narcotics trafficking, whether because the informant had misidentified Target A, defendant had replaced Target A sometime after the informant's information, or defendant was one of the "other" distributors the informant mentioned. *See United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (noting that officers can demonstrate reasonable suspicion if otherwise innocent factors "in their totality serve to eliminate a substantial portion of innocent travelers"). As discussed above, reasonable suspicion requires even less than a "fair probability"

27

that criminal activity is occurring, so long as officers can point to objective, articulable, and specific facts to suspect a particular person of criminal activity. *See also Glover*, 140 S. Ct. at 1188 ("The reasonable suspicion inquiry falls considerably short of 51% accuracy for, as we have explained, to be reasonable is not to be perfect."). There is vanishingly small chance that any other individual at the Aloft Hotel that morning had so many characteristics collectively adding up to involvement in narcotics trafficking.

Taking all of these facts together as a whole picture, the detectives had ample reasonable suspicion, "which is simply a particularized and objective basis for suspecting the person stopped of criminal activity." *Jordan*, 952 F.3d at 166; *see also Mitchell*, 963 F.3d at 390 (noting that reasonable suspicion merely requires "at least a minimal level of objective justification for making the stop"). The officers here acted not on the basis of hunches or unfounded guesses; they followed a growing collection of objective indicia that ultimately resulted in at least the quantum required for a basic investigatory stop. And because the officers had reasonable suspicion of a narcotics trafficking, that suspicion justified defendant's continued stop for roughly fifteen minutes until a drug-sniffing dog could conduct a free-air sniff of the vehicle. *See, e.g.*, *United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010) (holding that reasonable suspicion of narcotics trafficking permits extending a stop until a drug-sniffing dog can conduct a free-air search); *Branch*, 537 F.3d at 340 (same).

28

Once Doug alerted to the narcotics, officers then had probable cause to search the interior of the vehicle. *See Mason*, 628 F.3d at 130; *Branch*, 537 F.3d at 340 n.2. Accordingly, the Court should affirm the denial of defendant's motion to suppress.

## II. Defendant's outstanding warrant provided an independently sufficient basis for the traffic stop.

Separate from reasonable suspicion of narcotics trafficking, Detective Beha's investigation of defendant after finding his name in the Aloft registry returned an outstanding arrest warrant from Georgia through the VCIN/NCIC system. Because officers may rely on the facial validity of a warrant to initiate a brief investigatory stop and confirm its status, this fact provides an independent basis on which to sustain the lawfulness of the traffic stop.[11] Moreover, even were this Court to conclude that the Georgia warrant was insufficient justification, the officers relied on it and their departmental policies in good faith, and the evidence should not be suppressed.

### A. Officers may conduct an investigatory stop to gather more information about an out-of-jurisdiction warrant.

In 1985, the Supreme Court held that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop

---

[11] The district court did not address the government's argument on this point. However, this Court is not limited to the district court's reasoning and may affirm the denial of a motion to suppress on any ground supported by the record. *See, e.g.*, *United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012).

to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *United States v. Hensley*, 469 U.S. 221, 232 (1985). The Court noted that it had previously determined that officers may rely on the facial validity of a warrant issued by another jurisdiction and that the lawfulness of such an arrest would turn only on the existence of probable cause for the warrant in the issuing jurisdiction. *See id.* at 230–31 (citing *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)). In the context of an investigatory stop, the Supreme Court held that because a non-warrant flyer provided the detaining officers with an objective basis to believe that another jurisdiction wanted the defendant for questioning, "this objective reading would justify a brief stop to check Hensley's identification, pose questions, and inform the suspect that the St. Bernard police wished to question him." *Id.* at 234. Further, because "an experienced officer could well assume that a warrant might have been obtained in the period after the flyer was issued," the Court found that "the flyer would further justify a brief detention at the scene of the stop while officers checked whether a warrant had in fact been issued." *Ibid.*

After finding defendant's name in the hotel registry and before defendant appeared in person, Detective Beha received a VCIN/NCIC notification about an outstanding warrant from Georgia. *See* JA74, 150; *see also* JA45 (Exh. 1). Courts regularly recognize that an NCIC "hit" can provide officers with adequate reasonable suspicion to conduct an investigatory stop and even probable cause for an arrest. *See,*

30

*e.g.*, *Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 928 (9th Cir. 2001) (citing cases holding "that an 'NCIC hit,' although not definitive in terms of conviction, has been routinely accepted in establishing probable cause for a valid arrest"); *see also Mendoza v. U.S. Immigr. & Customs Enf't*, 849 F.3d 408, 418–19 (8th Cir. 2017); *Capone v. Marinelli*, 868 F.2d 102, 105–06 (3d Cir. 1989); *United States v. McDonald*, 606 F.2d 552, 553–54 (5th Cir. 1979).

Defendant objects to this basis for the stop on the grounds that the officers should have called the Georgia jurisdiction to confirm the status of the warrant before conducting an investigatory stop. *See* Def. Br. 13–14. But the Supreme Court has held that "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques"; in other words, police are not required to use "less intrusive means to verify their suspicions before stopping [a suspect]." *Sokolow*, 490 U.S. at 11. Moreover, defendant's argument cannot withstand *Hensley* itself. In the Sixth Circuit opinion reversed by the Supreme Court, the court of appeals "refuse[d] to expand the *Terry* doctrine to encompass police attempts to round up people against whom arrest warrants may have been issued" as an "'arrest now, verify warrant later' policy that … simply stretches the constraints of the Fourth Amendment beyond all reasonable limits." *United States v. Hensley*, 713 F.3d 220, 225 (6th Cir. 1983), *rev'd*, 469 U.S. 221. The Su-

preme Court disagreed with this characterization: instead, it held that based on an-other jurisdiction's flyer, officers could conduct brief investigatory stops to ask ques-tions or while "attempting to obtain further information," including "whether a war-rant *had in fact been issued*." *Hensley*, 469 U.S. at 232 (emphasis added). In doing so, the Court observed that "[t]he law enforcement interests promoted by allowing one department to make investigatory stops based upon another department's bulle-tins or flyers are considerable, while the intrusion on personal security is minimal." *Ibid.*[12] The Court held so even assuming the flyer was based on less than probable cause. *Id.* at 234. *A fortiori*, the actual warrant here provided ample basis for an investigatory stop, during which officers could then call the issuing jurisdiction to inquire about the warrant's current status.

Similarly, defendant argues that because Officer Byrd's Mobile inquiry re-turned the warrant's status as non-extraditable, that result immediately dissipated any basis for the stop before the K-9 alerted. *See* Def. Br. 14. But again, that contra-venes *Hensley*, in which an advisory that was not an arrest warrant *at all* supported

---

[12] The Court's rationale thus supports the reasoning behind the Chesapeake Po-lice Department and national NCIC policy, which Detective Beha explained is to ensure that neither jurisdiction has its resources wasted when there is no real chance of securing a suspect's actual arrest and extradition. *See* JA76, 79, 111–12l; *see also* JA102 (Detective Beha noting that when he received the initial NCIC hit, he did not know whether defendant was still in Virginia).

a reasonable investigatory stop to conduct further inquiry. As Detective Beha testi-
fied, the Chesapeake Police Department and national NCIC policies requiring con-
firmation even for non-extraditable warrants took account of the fact that an issuing
jurisdiction could update the warrant's status in either direction, as he had personally
observed. JA80–81; *see also* JA48–49. *Hensley* expressly approves the continuance
of investigatory stops to obtain up-to-date information. *See* 469 U.S. at 232, 234.

Even assuming that the traffic stop here was based solely on the Georgia war-
rant, Officer Byrd and Detective Rombs were still permitted to conduct a dog-sniff
as long as the traffic stop was not extended for that purpose or any such delay was
de minimis. *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005); *United
States v. Green*, 740 F.3d 275, 280 (4th Cir. 2014). Here, Doug alerted to narcotics
outside the driver's open door approximately four to six minutes before the dis-
patcher returned confirmation that defendant's warrant was non-extraditable. *Com-
pare* JA134–35 (Doug alerts between 12:16 and 12:17 p.m.), *with* JA119 (dispatcher
responds to Officer Byrd's warrant check between 12:21 and 12:22 p.m.). Once
Doug alerted to the narcotics, the officers present had probable cause to search the
remainder of the vehicle. *See Mason*, 628 F.3d at 130; *Branch*, 537 F.3d at 340 n.2.

In sum, the Supreme Court has approved the brief investigatory stop em-
ployed here "in order to maintain the status quo" while confirming the most current
status of another jurisdiction's request for a particular individual. *Hensley*, 469 U.S.

at 232 (quoting *Adams*, 407 U.S. at 143). Because the officers conducted the dog-sniff before the warrant check completed, they obtained probable cause to search the vehicle during the permissible length of the traffic stop. Accordingly, the Court may affirm the denial of the motion to suppress on this independent basis.

**B.    The officers relied in good faith on the warrant and department polices.**

Even if the Court were to conclude that the warrant was insufficient justification for a stop, suppression is not appropriate because the officers and detectives were acting in good-faith reliance on established policies and procedures. The exclusionary rule does not apply when police mistakes that lead to an unlawful search are merely the result of isolated negligence and not "systematic error or reckless disregard of constitutional requirements." *Herring v. United States*, 555 U.S. 135, 147 (2009). As the Supreme Court has explained, the exclusion of evidence is not a necessary consequence of every Fourth Amendment violation, even assuming one occurs. *See United States v. Leon*, 468 U.S. 897, 905 (1984). When police act in "objectively reasonable reliance" on authorization for their actions, the benefits of the exclusionary rule—deterring bad police behavior—no longer outweigh the cost to society of suppressing probative evidence of criminal wrongdoing. *Herring*, 555 U.S. at 141–42.

This Court has recognized the Supreme Court's application of this doctrine when officers rely on out-of-jurisdiction warrants while noting that it would not excuse deliberate lies made to induce another officer's reliance. *See United States v. Rush*, 808 F.3d 1007, 1010–11 (4th Cir. 2015). Nonetheless, in *Herring*, the Supreme Court found that where a neighboring police department incorrectly and negligently (but not recklessly or intentionally) informed officers about an outstanding arrest warrant, the exclusionary rule did not bar admission fruits of the search incident to arrest. *See* 555 U.S. at 146. Similarly, in *Arizona v. Evans*, the Supreme Court applied the good-faith exception when police officers reasonably relied upon records indicating that there was an outstanding arrest warrant for the defendant, even when the records were later found to be inaccurate. *See* 514 U.S. 1, 15–16 (1995).

Here, defendant alleges no deliberate lies, recklessness, or systemic abuses of the sort that the Supreme Court held would necessitate application of the exclusionary rule. Rather, the detectives here (correctly) understood that there was an out-of-state warrant for defendant. In waiting to reach out to the issuing jurisdiction for confirmation, the officers followed both departmental and national policies, which were designed to conserve resources of both the inquiring and issuing jurisdictions. JA48, 49. Pursuant to those policies, the officers received confirmation that the warrant was non-extraditable only after defendant's car had been stopped and even then had to wait for confirmation from the issuing jurisdiction. The officers' reliance on

the warrant as the basis for the initial stop and its continuation pending that check was perfectly reasonable.

Had the K9 not alerted, and had the drugs not been found in the car, defendant would have been free to leave. But because the officers conducted the stop according to formal policies and conducted the dog-sniff within the duration of the warrant check, they acted in compliance with what they thought to be established constitutional constraints. Suppressing the nearly 1.8 kilograms of methamphetamine recovered from defendant's vehicle, as well as the other extensive evidence of criminal narcotics conspiracy recovered from subsequent searches, would serve none of the goals of the exclusionary rule. Accordingly, even if the Court were to conclude that the Georgia warrant did not provide a legally adequate basis for the stop, it should decline to order suppression because of the officers' objectively reasonable reliance on facially permissible policies.

## CONCLUSION

For the reasons stated above, this Court should affirm the judgment of the district court.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____

Aidan Taft Grano-Mickelsen
Andrew Bosse
John F. Butler
Amanda Turner
Assistant United States Attorneys
Attorney for the United States
U.S. Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510
Phone: (757) 441-6331
Fax: (757) 441-6689
Email: aidan.grano-mickelsen@usdoj.gov
andrew.bosse@usdoj.gov
john.f.butler@usdoj.gov
amanda.turner@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are neither novel nor complex, and oral argument likely would not aid the Court in reaching its decision.

## CERTIFICATE OF COMPLIANCE

I certify that I wrote this brief using 14-point Times New Roman typeface and Microsoft Word 2016. I further certify that this brief does not exceed 13,000 words (and is specifically 7,491 words) as counted by Microsoft Word, excluding the items identified in Federal Rule of Appellate Procedure 32(f).

/s/

Aidan Taft Grano-Mickelsen
Assistant United States Attorney